UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| ROGER SCHLEBEN,<br>        Plaintiff,<br><br>v.<br><br>CARPENTERS PENSION TRUST FUND—<br>DETROIT AND VICINITY, and TRUSTEES<br>OF CARPENTERS PENSION TRUST<br>FUND—DETROIT AND VICINITY,<br>        Defendants. | Case No. 14-cv-11564<br>Honorable Laurie J. Michelson<br>Magistrate Judge Mona K. Majzoub |
| THOMAS E. UNDERWOOD, individually<br>and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>CARPENTERS PENSION TRUST FUND—<br>DETROIT AND VICINITY, and TRUSTEES<br>OF CARPENTERS PENSION TRUST<br>FUND—DETROIT AND VICINITY,<br><br>        Defendants. | Case No. 13-cv-14464<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER GRANTING IN PART PLAINTIFF SCHLEBEN'S MOTION
FOR DAMAGES [48], GRANTING IN PART PLAINTIFF UNDERWOOD'S
MOTION FOR PREJUDGMENT INTEREST [86], AND GRANTING IN PART
PLAINTIFF UNDERWOOD'S MOTION FOR COSTS AND ATTORNEYS' FEES [87]**

This ERISA case is before the Court on several motions surrounding attorneys' fees and

prejudgment interest. The facts are described in detail in the Court's prior orders. But in short,

the Carpenters Pension Trust Fund—Detroit and Vicinity, a multiemployer benefits plan subject

to the Employee Retirement Income Security Act ("the Plan"), had an amendment procedure

stating that "no amendment of this Plan shall be permitted to reduce . . . the benefits of any person who is already receiving benefits." In August 2013, the Plan's trustees amended the Plan, reducing the disability benefits that Plaintiffs Thomas Underwood and Roger Schleben (and others) had already started to receive. Both sued. The Court certified a class action in Underwood's case, *see Underwood v. Carpenters Pension Trust Fund-Detroit & Vicinity*, No. 13-CV-14464, 2014 WL 4602974 (E.D. Mich. Sept. 15, 2014), and Schleben pursued his claim separately.

In September 2014, the Court granted Underwood's motion for summary judgment, holding that to the extent that the August 2013 Amendment reduced the benefits that Underwood and other class members had already started to receive on the date the amendment became effective, it violated the Plan and was unenforceable. *Underwood v. Carpenters Pension Trust Fund--Detroit & Vicinity*, No. 13-CV-14464, 2014 WL 9866416 (E.D. Mich. Sept. 15, 2014). For similar reasons, the Court also denied Defendants' motion to dismiss Schleben's complaint. *Schleben v. Carpenters Pension Trust Fund-Detroit & Vicinity*, No. 14-CV-11564-LJM, 2014 WL 4604000 (E.D. Mich. Sept. 15, 2014).

Nonetheless, after these orders, in October 2014, the trustees amended the Plan's amendment provision to permit the very type of amendment that the Court had just held to be unenforceable under the prior version of that provision: amendments that reduce the benefits of participants already receiving them. Defendants also backdated the October 2014 Amendment to apply prior to the August 2013 Amendment. The Court allowed the parties to brief whether the October 2014 Amendment, like the prior amendment, violated the Plan's terms. And in September 2015, the Court held that it did, granting Underwood's and Schleben's motions for

2

summary judgment. *Schleben v. Carpenters Pension Trust Fund-Detroit & Vicinity*, No. 13-CV-14464, 2015 WL 5655838 (E.D. Mich. Sept. 25, 2015).

Now before the Court are several motions: (1) Schleben's motion for damages (*Schleben*, No. 14-11546, Dkt. 48); (2) Underwood's motion for prejudgment interest (*Underwood,* No. 13-14464, Dkt. 86); and Underwood's motion for costs and attorneys' fees (*Underwood*, Dkt. 87). After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motions. *See* E.D. Mich. LR 7.1(f)(2). For the reasons discussed below, the Court will grant the three pending motions in part.

## I.

The Court begins with the issue of prejudgment interest. Schleben asks the Court to award a prejudgment interest rate of 15%, which he says falls between the Plan's expected rate of return during the relevant time (8%) and the interest rate on credit card debt he amassed because of his reduced benefits (29.99%). (Dkt. 48, Schleben's Mot. at 7.) Underwood asks the Court to award a rate of 13.31%, the average of what he says was the Plan's rate of return (7.5%), the return the class members could have earned by investing their lost benefits in the stock market (8%), and two rates reflecting interest rates that class members may have had to borrow at to replace their benefits—the national average credit rate (15%) and the average credit rate for people with "bad credit" (22.73%). (Dkt. 87, Underwood's Mot. Pre-J. Interest at 8.) In response, Defendants suggest that the Court should consider the statutory post-judgment interest rate, which currently sits well below 1%, at the time of judgment. (*Underwood*, Dkt. 90, Defs.' Resp. to Underwood's Mot. Pre-J. Interest at 4; *see also Schleben*, Dkt. 49, Defs.' Resp. at 3.) For the reasons discussed below, the Court will award prejudgment interest at a rate of 5.48%.

**A.**

"Although ERISA does not mandate the award of prejudgment interest to prevailing plan participants, . . . [a] district court may do so at its discretion in accordance with general equitable principles." *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616 (6th Cir. 1998) (citations omitted). "An award that fails to make the plaintiff whole due to an inadequate compensation for her lost use of money frustrates the purpose of ERISA's remedial scheme." *Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, 711 F.3d 675, 686 (6th Cir. 2013). So too does an excessive award. *See Uniroyal Pension Plan*, 154 F.3d at 618.

The Court finds that prejudgment interest is warranted in this case. Defendants have reduced Plaintiffs' disability benefits for over two and a half years. Some interest is necessary to make the Plaintiffs whole, in furtherance of ERISA's remedial purpose. *See Schumacher*, 711 F.3d at 686. And Defendants do not appear to claim that prejudgment interest is unwarranted—they only contest the applicable rate.

**B.**

Which interest rate to award is the tougher question. In ERISA cases, "[w]hile district courts may fashion an award [of prejudgment interest] in their sound discretion, such an award must consider the case-specific factors such as, but not limited to: the remedial goal to place the plaintiff in the position that he or she would have occupied prior to the wrongdoing; the prevention of unjust enrichment on behalf of the wrongdoer; the lost interest value of money wrongly withheld; and the rate of inflation." *Schumacher*, 711 F.3d at 687.

The factors concerning the "lost interest value of money wrongly withheld" and the inflation rate lead the Court to reject the extremely low rate proposed by Defendants: the rate commonly used for *post*-judgment interest. Post-judgment interest is governed by 28 U.S.C.

4

§ 1961(a), which uses one-year Treasury rates to calculate interest on money judgments *after* the entry of a judgment: "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding . . . the date of judgment." The Sixth Circuit has made clear that "a mechanical application of [the one-year Treasury] rate at the time of the award amounts to an abuse of discretion." *Schumacher*, 711 F.3d at 686. In *Schumacher*, the Court held that the district court abused its discretion by awarding prejudgment interest by simply applying the one-year Treasury rate at the time of judgment, a modest 0.12%. *Id.* at 687. That being said, courts often award prejudgment interest at a rate that averages the published one-year Treasury rates over the time of the dispute. *See Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740, 752 (6th Cir. 2014) (affirming blended rate pursuant to 28 U.S.C. § 1961 ranging from 6.13% to 0.14% over period of 17 years of disputed fees at issue in case); *see also Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 585 n.3 (6th Cir. 2002) (noting approval of blended one-year Treasury rate method).

The problem here is that a rate averaging one-year Treasury rates since the time this dispute started in August 2013 would not adequately compensate Plaintiffs. The parties have not provided figures for the entire period, but the Court takes judicial notice that the weekly average one-year constant maturity Treasury yield from August 2013 through February 19, 2016 has ranged from 0.09% to 0.71%, and the average of the weekly averages during that time has been a mere 0.22%. *See* Bd. of Governors of the Fed. Reserve Sys., *Federal Reserve Statistical Release: H.15 Selected Interest Rates, http://www.federalreserve.gov/releases/h15/data.htm.* A rate of 0.22% would be too low to compensate Plaintiffs for inflation. According to data cited by Underwood, inflation ranged from 1.6% to 2.1% annually during the relevant period.

5

(Underwood's Mot. Pre-J. Interest at 6.) Nor would such a low rate compensate Plaintiffs for the lost interest value of their withheld benefits. For instance, Defendants pointed the Court to certificate of deposit data available on the St. Louis Federal Reserve Bank's website. (*See* Defs.' Resp. Ex. 4.) The Court takes judicial notice that such data indicate that the national weekly average rate for a certificate of deposit for a deposit of less than $100,000 for 36-months (the term closest to the amount of time Plaintiffs' benefits have been withheld) has ranged from 0.45% to 0.49% since August 2013. *See* Fed. Reserve Bank of St. Louis, *National Rate on Non-Jumbo Deposits (less than $100,000): 36 Month CD*, *https://research.stlouisfed.org/fred2/series/ CD36NRNJ*.

It is therefore unsurprising that during a period marked by low interest rates in the wake of the global financial crisis of 2008, some courts have recognized that the one-year Treasury rate has limited relevance for calculating prejudgment interest. *See*, *e.g.*, *Masters v. Supplemental Executive Ret. Plan for Automated Packaging Sys., Inc.*, No. 5:07 CV 1826, 2009 WL 1183377, at *2 (N.D. Ohio May 1, 2009) ("In the Court's view, the dramatically low federal rates of 2008 and 2009 would fail to adequately compensate plaintiff for the lost use of money and achieve ERISA's remedial goal."). So the Court will not apply the § 1961 rate here. Nevertheless, because interest rates and inflation have been so low, the Court notes that it would not take a very high rate to compensate Plaintiffs for the lost interest value of their money withheld and inflation.

Still, compensation for lost interest value and inflation are not the only factors at play. The Court also must consider "the remedial goal to place the plaintiff[s] in the position that [they] would have occupied prior to the wrongdoing." *Schumacher*, 711 at 687. On that note, Plaintiffs point to credit card borrowing rates that—in contrast to Treasury rates—are extremely

high. True, to assess how to put Plaintiffs' into the positions they would have occupied prior to the wrongdoing, it is more sensible to consider the rates at which they "would have paid to borrow money rather than the rate at which [they] would have lent it to the government." *See Jones v. UNUM Life Ins. Co. of Am.,* 223 F.3d 130, 140 (2d Cir. 2000). But Plaintiffs fail to cite any ERISA cases reflecting prejudgment interest awards based on credit card rates. Instead, in the only case that Underwood cites, a court specifically rejected using a 15% interest rate because "[w]hile . . . much of plaintiff's credit card debt is incurring interest of that magnitude, it appears that most of the debts he has been forced to incur are to friends and relatives, or are deferred payments, all of which bear interest (if they bear interest at all) in an unknown percentage." *Peterson v. Cont'l Cas. Co.*, No. 99CIV.0847, 2000 WL 1909775, at *1 (S.D.N.Y. Dec. 18, 2000) *aff'd in part, vacated in part on other grounds*, 282 F.3d 112 (2d Cir. 2002). Other courts have similarly rejected the use of credit card rates for prejudgment interest. *See Smyrni v. U.S. Investigations Servs. LLP*, No. C 08-4360 PJH, 2010 WL 807445, at *3 (N.D. Cal. Mar. 5, 2010) (adopting report and recommendation that noted that "Plaintiff has provided no legal authority for using a credit card interest rate as an appropriate benchmark for determining prejudgment interest."); *see also Brown v. Cont'l Cas. Co.*, No. CIV.A. 99-6124, 2005 WL 1949610, at *5 (E.D. Pa. Aug. 11, 2005) (holding that "[t]here is no legal basis" for a prejudgment interest award based on average credit card borrowing rates).

Even if credit card rates were an appropriate measure of the rate necessary to compensate Plaintiffs for their withheld disability benefits, Plaintiffs here have not put forth any evidence showing the extent to which, if at all, they borrowed with credit cards to replace their lost disability income. Underwood offers two national credit card averages as rates at which Plaintiffs "might have borrowed." (Underwood's Mot. Pre-J. Int. at 6.) For his part, Schleben said only this

about his credit card debt: "This month [January 2015], I was unable to pay the amount on my ABC Warehouse credit card, and have been charged interest at a rate of 29.99%. If I had received the my [sic] full disability retirement benefit . . . I would have been able to make the full payment on this credit card, and would have avoid any interest charge." (Schleben's Mot. Ex. G, Schleben Aff. ¶ 8.) In other words, he said he was unable to pay in full one credit card—for an unspecified amount—in one month. Without more evidence of the credit card debt Plaintiffs assumed to replace their benefits, the Court finds that using high credit rates to determine prejudgment interest could lead to an excessive award, frustrating the purpose of ERISA's remedial scheme. *See Uniroyal Pension Plan*, 154 F.3d at 618.

As another consideration of the rate necessary to compensate Plaintiffs, Underwood points to the potential return on investment that the Plaintiffs could have earned in the stock market. (Underwood's Mot. Pre-J. Int. at 5.)  He estimates this to be 8%, the rate of return on the S&P 500 index over the past several years (roughly 12%) less the 4% rate at which individual investors often lag that index in their personal investments. (*Id.*) But Underwood cites no authority to support using a plaintiff's possible personal stock market returns to calculate prejudgment interest in an ERISA case surrounding disability benefits. Moreover, the Court can only speculate as to whether the plaintiffs would have invested all, some, or even any of their disability proceeds in the stock market. If anything, arguments Underwood makes elsewhere in his briefing suggests that Plaintiffs' benefits were not the type of disposable income that one would put into a speculative stock market investment. For instance, to argue that the Court should consider credit card rates, Underwood urges that without their full benefits, many Plaintiffs "struggle to meet their monthly obligations." (Dkt. 93, Underwood's Repl. at 4 (citing letters, emails and faxes from individuals who converted early to full retirement benefits after

their disability benefits were reduced).) Thus, the Court finds that in the circumstances of this case, it need not consider the Plaintiffs' possible stock market returns to calculate prejudgment interest.

But the Court must consider "the prevention of unjust enrichment on behalf of the wrongdoer." *See Schumacher*, 711 F.3d at 687. Accordingly, while it makes little sense here to consider the Plaintiffs' possible investment returns, it is appropriate to consider the Plan's investment returns. *See Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 982, 986 (6th Cir. 2000) ("Using the interest rate actually realized by TRW on the relevant funds seems an appropriate way of avoiding unjust enrichment."). Defendants suggest that because the Plan is a defined benefit plan, its returns are irrelevant. (Def.'s Resp. to Underwood's Mot. Int. at 3–4.) But Defendants' position ignores the Sixth Circuit's requirement for the Court to consider unjust enrichment when fashioning a prejudgment interest award in an ERISA case. *See Schumacher*, 711 F.3d at 687. It also overlooks that the Sixth Circuit has affirmed using a defined benefit plan's rate of return: "Because the plan with which we are concerned in this case is a defined benefit plan, TRW has to contribute only enough money to fund the plan's defined obligations. If TRW were able to keep part of the return on wrongfully withheld funds, it would have to contribute that much less to fund the plan's obligations to other retirees." *See Rybarczyk*, 235 F.3d at 987.

Though Defendants' rate of return is appropriate to consider here, the parties disagree on what that rate actually is. Both Schleben and Underwood point to the Plan's "Notice[s] of Critical Status," in which the Plan indicated that it "expected" a rate of return of 8% in 2013 and 7.5% in 2014 and 2015. [1] (*See* Schleben's Mot. at 7; *Schleben's* Mot. Ex. I; Underwood's Mot. at

---

[1] Schleben argues that only a fund's *expected* rate of a return matters, and that "the 6th Circuit has specifically rejected a Pension Plan's actual investment earnings as the basis for establishing the proper pre-judgment interest rate." (Dkt. 50, Schleben's Repl. at 1.) He adds that

4; Underwood's Mot. Ex. 1.) Underwood says that based on these notices it is "reasonable to conclude that the Plan has earned approximately 7.50%" during the relevant period. (Underwood's Mot. at 4.) Defendants provide a much lower estimate. They submitted an affidavit from an actuary who states that the Plan's geometric average rate of return for the period from August 2013 through November 2015 was only 3.287%. (*Underwood*, Dkt. 94, Smith Aff. ¶ 4.) But the affidavit provides no details concerning the method of calculation. And the actuary's previous calculation for the period from August 2013 through December 2014 suggested that the return during that earlier period was much higher at 6.3254%. (Defs.' Resp. to Underwood's Mot. at 4.)

In light of the disputed rate of return and the limited information in the record, the Court finds that the best way to prevent unjust enrichment here is to split the difference and apply a prejudgment interest rate of 5.48%, which reflects an average of (a) the average "expected" rates of return from 2013–15 (7.66%) and (b) the Plan's stated "actual" rate of return (3.287%). While no rate would be perfect, a prejudgment interest rate of 5.48% is consistent with the *Schumacher* factors.[2] This rate would not only neutralize Defendants' unjust enrichment but also more than

---

"[t]he purpose of prejudgment interest is to make the participant whole, not to disgorge ill gotten gains from the pension plan." (*Id.*) He cites *Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 375 (6th Cir. 2015) (en banc). That case held that a plaintiff could not recover disgorgement of profits under ERISA § 503(a)(3) absent a showing that his recovery of benefits under § 502(a)(1)(B) was an inadequate remedy. *Id.* at 371. The Court made no express holdings on the issue of prejudgment interest, other than to remand the case to the district court to consider that issue. *Id.* at 376.

[2] The Court considered as an alternative using a rate of 9.51%, a simple average of all of the proposed rates: Underwood's proposed rate of 13.31%, Schleben's proposed rate of 15%, and the average § 1961 rate of 0.22%. But the Court finds that the Plan's rate of return is the most appropriate rate for a case like this, where the Defendant is a fund with an observable rate of a return. The Court also notes that neither party suggested using another possible alternative, the Michigan statutory prejudgment interest rate under Mich. Comp. Law. § 600.6013. *See, e.g.*, *Safran v. Donagrandi*, No. 08-12366, 2009 WL 1133462, at *2 (E.D. Mich. Apr. 27, 2009) (awarding prejudgment interest at the Michigan statutory rate in an ERISA case); *but see Ford v.*

compensate Plaintiffs for inflation and the lost interest value of the money withheld (both having much lower rates than 5.48%). And understandably, in a case like this involving disability benefits, Plaintiffs likely had to borrow at least some money at high credit rates to replace their benefits. While no evidence shows the extent to which Plaintiffs did so, or at what rates, a rate of 5.48% will somewhat compensate Plaintiffs for any such borrowing, putting them closer to the position they would have been in had Defendants not reduced the benefits. Furthermore, this rate is not so high that it is punitive in these circumstances.

Finally, the Court finds that the prejudgment interest rate of 5.48% should be applied in a "stream of benefits" method, which has been endorsed by the Sixth Circuit. *See Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 585 (6th Cir. 2002) (affirming district court's use of method that "calculated the interest due on each monthly payment of disability benefits beginning with the date that each payment was due"). The parties are to stipulate to the actual calculation of the award based on this rate and method.

## II.

Schleben and Underwood also ask the Court to award costs and attorneys' fees. Schleben asks for $88,887.50 in fees and $416.52 in costs. (Schleben's Mot. at 2.) Underwood asks for $996,231.76 in fees and $16,441.63 in costs. (Dkt. 87, Underwood's Mot. Fees at 26.) As discussed below, the Court will award most but not all of the requested fees.

## A.

ERISA § 502(g)(1) provides that "[i]n an action under this title . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). As the Supreme Court has held, "[A]

---

*Uniroyal Pension Plan,* 154 F.3d 613, 618–19 (6th Cir. 1998) (affirming rejection of that rate in an ERISA case because the rate would be punitive).

fees claimant must show some degree of success on the merits before a court may award attorney's fees under § 1132(g)(1)." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010) (internal quotation marks and citations omitted). And here, because the Court has found that Defendants violated the Plan when they amended it in such a way that reduced Plaintiffs' disability benefits, the Plaintiffs have achieved "some degree of success on the merits."

But the Court must also examine additional factors to determine whether a fee award is appropriate:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

*Shelby Cty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 376 (6th Cir. 2009) (citation omitted); *see also Sec'y of Dep't of Labor v. King*, 775 F.2d 666, 669 (6th Cir.1985) (creating the five-factor test). "No single factor is determinative." *Moon v. Unum Provident Corp.*, 461 F.3d 639, 642–43 (6th Cir. 2006) (per curiam).

Starting with the first factor, the Court finds that Defendants' degree of culpability and bad faith weighs in favor of awarding fees—but only to the extent that the fees relate to the October 2014 Amendment. The Court gives Defendants the benefit of the doubt that the August 2013 amendment was a good faith attempt to address the Plan's underfunded status. Defendants cite an affidavit from a Trustee, who stated that "[u]pon careful consideration and after consulting with legal counsel and other advisors, the Trustees determined that the changes made to disability benefits [were] legally required by the [Pension Protection Act's] 'red zone' provisions regarding plans in critical status and the All Reasonable Measures Plan, in order to eventually emerge from critical status or forestall insolvency." (*Schleben*, Dkt. 34, Defs.' Mot.

Summ. J. Ex. 4, Jackson Aff. ¶ 7.) The Trustee further stated that the Trustees interpreted the Plan's amendment procedure to prohibit amendments only to participants receiving "Accrued Benefits." (*Id.* at ¶ 8.) The Court ultimately disagreed with both of these conclusions. *See Underwood v. Carpenters Pension Trust Fund--Detroit & Vicinity*, No. 13-CV-14464, 2014 WL 9866416, at *12 (E.D. Mich. Sept. 15, 2014). But that does not mean that the Trustees acted in bad faith.

Granted, as Schleben points out (Dkt. 50, Schleben's Repl. at 3), even if the Trustees did not act in bad faith, courts have observed that "culpability" and bad faith "are not the same." *See Myers v. Bricklayers & Masons Local 22 Pension Plan*, No. 3:13-CV-75, 2014 WL 7005193, at *4 (S.D. Ohio Dec. 10, 2014). Yet when it comes to the August 2013 Amendment, the most the Court can say is that the Trustees misinterpreted the Plan and the law, and "erroneous interpretation of certain terms in . . . plan documents does not constitute culpable conduct for purposes of determining whether to award attorney fees." *See Shelby Cty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 377 (6th Cir. 2009).

But that does not excuse the October 2014 Amendment. After the Court's September 2014 orders holding that the August 2013 Amendment violated the Plan's amendment procedure, the Defendants attempted to retroactively amend that very amendment procedure to give effect to the August 2013 Amendment. This action was little more than an attempt to circumvent the Court's orders. Defendants did not disclose the full scope of this amendment until months later, leading Schleben to file a motion for summary judgment in late January 2015 that did not even touch on the October 2014 amendment (Dkt. 30), necessitating supplemental briefing on this issue. Thus, a portion of the fees in this case were entirely avoidable. Defendants do not even address the October 2014 Amendment in analyzing this first factor. Thus, the Court concludes

that the first factor weighs in favor of awarding fees—but only after the October 2014 Amendment.

Moving to the second factor, the Court finds that Defendants' ability to pay weighs neither in favor nor against awarding fees. The Plan is currently still in a "critical" underfunded status. (Defs.' Resp. Underwood's Mot. Fees Ex. 1, Annual Funding Notice.) And the Court agrees with Defendants that "[p]ayment of fees in this case does nothing to help this Plan on the road to recovery." (*See* Defs.' Resp. Underwood's Mot. Fees at 5.) However, this factor is considered "more for exclusionary than for inclusionary purposes," *Warner v. DSM Pharma Chemicals North America, Inc.*, 452 F. App'x 677, 682 (6th Cir. 2011) (citation omitted), and the Court finds that the Plan still has the ability to pay a fee award. The Plan's assets are valued over $700 million. According to the Plan's 2013 IRS Form 5500, its assets were around $728 million at that time. (*See* Schleben's Mot. Ex. B.) Similarly, the Plan's latest annual funding notice states that as of April 2015, the Plan's assets had a fair market value of over $748 million. (Defs.' Resp. Underwood Mot. Fees Ex. 1, Annual Funding Notice.) The fees sought here—for both cases a combined total of just over $1.1 million—are a fraction of 1% of the Plan's value. Thus, while this factor does not necessarily weigh in favor of awarding fees, the Court sees no reason to exclude fees on the basis of the Plan's ability to pay.

As for the next factor, deterrence, the Sixth Circuit has observed that "fee awards are likely to have the greatest deterrent effect where deliberate misconduct is in the offing." *Foltice v. Guardsman Products, Inc.*, 98 F.3d 933, 937 (6th Cir. 1996). Defendants do not address this factor. Still, the Court finds that like the first factor, the strength of the weight of this factor depends on which part of the case is examined. On one hand, the Court sees little reason to deter the motives underpinning Defendants' August 2013 Amendment. Too strong of a deterrent effect

14

could undermine critically underfunded plans' obligations under the Pension Protection Act to adopt rehabilitation plans. *See* 29 U.S.C. § 1085. And some measures adopted under such rehabilitation plans will inevitably lead to bona fide disputes such as the one surrounding the August 2013 Amendment. But the Court finds greater deterrent value relating to the conduct associated with Defendants' October 2014 Amendment, an attempted end run around the Court's orders. So like the first factor, this factor weighs in favor of awarding fees—but only fees that came in the wake of the October 2014 Amendment.

Under the fourth factor, the Court must consider "whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA." *Shelby Cty. Health Care Corp.*, 581 F.3d at 376. Defendants say that the class of roughly 300 is too small to justify an award because the Plan has 18,722 participants. (*See* Defs.' Resp. Schleben's Mot. at 7; Defs' Resp. Underwood's Mot. Int. at 5.) There is some support for this position. *See Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 919-20 (6th Cir. 2000) (affirming denial of fees where district court found, among other things, "while this was a class action, plaintiffs did not seek to confer a common benefit on all participants of Joy's ERISA plan."). Nonetheless, Underwood indeed sought to confer a common benefit on all the participants of the Plan who had already started to receive disability benefits before the August 2013 Amendment. And though Schleben opted to pursue his claims individually, the issues he raised were common to other similarly situated beneficiaries. Moreover, the Court's interpretation of the Plan's amendment provision, an interpretation urged by both Schleben and Underwood, has potential upside for other Plan participants as well: the Trustees are constrained in their ability to reduce the benefits of those already receiving them. Additionally, the Court notes that this case did involve "significant legal questions regarding

15

ERISA," including the retroactive application of plan amendments and the scope of plans' limitations and obligations under the Pension Protection Act.

Finally, the Court concludes that the fifth factor, the "relative merits of the parties," also weighs in favor of fees, even if slightly. Defendants are correct to point out that they did prevail on certain issues, including whether they violated ERISA § 305, *see Underwood v. Carpenters Pension Trust Fund--Detroit & Vicinity*, No. 13-CV-14464, 2014 WL 9866416, at *8 (E.D. Mich. Sept. 15, 2014). But the core of this case has been whether the Defendants violated the Plan's terms when they adopted the August 2013 and October 2014 Amendments. And on those ultimate issues, Plaintiffs' positions had more merit. Thus, this factor weighs in favor of fees.

In sum, only two of the five factors to some extent weigh in favor of fees for the entire case, but four of the five factors to some extent weigh in favor of fees for the part of the case stemming from the October 2014 Amendment. Therefore, on balance the Court finds that at least some fee award is appropriate in this case.

## B.

The next issue is how much. In ERISA cases, "the award of attorneys' fees must be reasonable as determined under the 'lodestar' approach." *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir. 1995). The lodestar is calculated by multiplying a "reasonable hourly rate by the proven number of hours reasonably expended on the case by counsel." *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004). Once the lodestar is calculated, that "does not end the inquiry." *Grandview Raceway*, 46 F.3d at 1401–02. "There remain other considerations that may lead the district court to adjust the fee upward or downward." *Id.* (citation omitted).

16

**1.**

Starting with what qualifies as a "reasonable hourly rate," the Court notes that Defendants do not make any specific objections to the hourly rates that Plaintiffs' attorneys propose. Nevertheless, as the Supreme Court has held, "the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 896 (1984) (addressing fees in civil rights context). Courts use the "prevailing market rates" that "lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000). The Court may look to prior awards as "inferential evidence of what a market rate is." *B & G Min., Inc. v. Dir., Office of Workers' Comp. Programs*, 522 F.3d 657, 664 (6th Cir. 2008).

Schleben's attorney, Lawrence Breskin, says that a reasonable hourly rate for his work is $325. (Schleben's Mot. at 13.) The Court agrees. Breskin has 36 years of employee benefits law experience, much of which he has spent as a solo practitioner. (*See* Schleben's Mot. Ex. D, Breskin Aff. ¶ 2.) His requested rate of $325 is below several relevant benchmarks in the most recent Michigan State Bar survey data of attorney billing rates, including (1) the 75th percentile rates for employment law plaintiff lawyers ($350), the 75th percentile rate for lawyers with over 35 years of experience ($350), the 75th percentile rate for lawyers with an office in downtown Detroit ($350), and the 95th percentile rate for several types of solo practitioners (ranging from $350–$383). *See* 2014 Economics of Law Practice Attorney Income and Billing Rate Summary Report, State Bar of Michigan ("Billing Rate Summary Report") (July 2014), http://www.michbar.org/file/pmrc/articles/0000151.pdf. The rate is also below the rate recently

17

awarded to a similar solo practitioner in an ERISA case in this district. *See Shaw v. AT&T Umbrella Benefit Plan No. 1*, No. 13-CV-11461, 2015 WL 8177654, at \*5 (E.D. Mich. Dec. 8, 2015) (finding in an ERISA case that $385 per hour was a reasonable rate for a solo practitioner in Ann Arbor with close to 20 years of ERISA litigation experience). Thus, the Court finds that $325 per hour is a reasonable rate for Breskin's services.

Underwood's attorneys ask for more. They say that $525 per hour is a reasonable rate for attorneys Eva Cantarella, Bradley Schram, and Robert Geller (all partners or shareholders at their firm); that $380 per hour is reasonable for Daniel Rucker (a senior associate); and that $135 per hour is reasonable for Lori Howes, a paralegal. (Underwood's Mot. Fees at 18.) Cantarella, Schram, and Geller certainly have experience in this type of case, having litigated 13 class actions involving pension benefits. (*Id.* Ex. 5, Cantarella Aff. ¶ 12; Ex. 6, Schram Aff. ¶ 10; Ex. 7, Geller Aff. ¶ 7.) Moreover, Cantarella has practiced for 21 years (Cantarella Aff. ¶¶ 8–9), Schram for 39 years (Schram Aff. ¶ 6–7), and Geller for 33 years (Geller Aff. ¶ 5). Additionally, Rucker has around 10 years of experience, much of it with his current firm. (Underwood's Mot. Fees Ex. 8, Rucker Aff. ¶¶ 6–7.)

"Courts in the Eastern District of Michigan have recently awarded rates as high as $475 per hour for lead and experienced class counsel in ERISA health benefit class actions." *Potter v. Blue Cross Blue Shield of Michigan*, 10 F. Supp. 3d 737, 747 (E.D. Mich. 2014) (adopting report and recommendation to award fees at rate of $475 per hour for managing partner, $350 for other partners, and $250 for associates). Additionally, according to the Michigan State Bar survey data referenced above, the 95th percentile rate for the lawyers with comparable experience to Underwood's attorneys is $488 for Cantarella, $525 for Schram, $515 for Geller and $370 for Rucker. *See* Billing Rate Summary Report at 4. Underwood's lawyers ask for increases over

these 95th percentile rates because they say that the rates from this data and the previous cases are out of date. (Underwood's Mot. at 17.) But they provide no evidence to show what the supposedly now inflated market rates are. The Court declines to find the current market rate based on mere speculation. Furthermore, while the Michigan bar's survey does not have a category for ERISA plaintiff lawyers, the 95th percentile rates for employment law plaintiff lawyers is $450 per hour, considerably less than the survey's 95th percentile rates based simply on years of experience. *See* Billing Rate Summary Report at 6.

The Court sees no evidence to justify departing so dramatically from prior fee awards or the Michigan bar survey. Thus, the Court finds that a reasonable rate for the partners, Cantarella, Schram, and Geller is $475 per hour. This is consistent with prior cases and places them close to the relevant 95th percentiles for lawyers with their experience. Further, the Court finds that a reasonable rate for Rucker, a senior associate, is $250 per hour. This too is consistent with prior cases, and it places him over the mean for lawyers with his level of experience. Given his immaterial role in the case—a handful of hours, mostly directed at the issues raised in this opinion—the Court sees no justification to find that he is entitled to compensation at the 95th percentile rate for attorneys with his level of experience. Finally, the Court finds that a rate of $125 per hour is reasonable for the paralegal's work. *See Hargrove v. Eaglepicher Corp.*, No. 2:10-CV-10946, 2012 WL 1668152, at *2 (E.D. Mich. May 10, 2012) (noting that recent fee awards in ERISA class actions in this district have approved, among other things an hourly rate of $125 for paralegals).

## 2.

As for the number of hours, Breskin submits that he performed 273.5 hours for Schleben, which he says excludes time spent on Schleben's administrative appeal. (Schleben's Mot. at 14;

19

*Id.* Ex. H.) Underwood's attorneys say that, after certain write-offs, they are entitled to fees for a total of 1,850 hours (and close to $1 million)—even though this case has been resolved without trial through dispositive motions and the class is a relatively modest size. (Underwood's Mot. Fees. at 23.) Defendants take issue with various entries in the billing records submitted by both Schleben and Underwood.

Defendants object that several of Breskin's billing entries are "intertwined" with Schleben's administrative claim and appeal, pointing out that fees associated with such appeals are not recoverable. *See Anderson v. Procter & Gamble Co.*, 220 F.3d 449, 456 (6th Cir. 2000) ("ERISA does not authorize recovery of attorneys' fees for work performed during the administrative exhaustion phase of a benefits proceeding"). These entries include reviewing the cases Defendants relied on to reduce Schleben's benefits (1.3 hours on November 20, 2013), researching the rights of plans to make amendments reducing the benefits of someone in pay status (5.5 hours on November 22, 2013), calling Schleben about the final denial (0.4 hours on February 21, 2014), reviewing the status of Underwood's case (0.2 hours on February 21, 2014), and reviewing Schleben's denial letter and appeal letter arguments (0.3 hours on March 13, 2014). (*See* Defs.' Resp. Schleben's Mot. at 8–9; *see also* Schleben's Mot. Ex. H, Schleben's Bills, at 2–3.)[3] Regarding Underwood, Defendants object to various billing entries as excessive or unnecessary. Some of the highest include the following: (1) a total of 92.75 hours for preparation for the hearing held on September 9, 2014; (2) 44.5 hours for researching a drafting the class certification brief; (3) 76.6 hours for responding to Defendants' motion to dismiss; and

---

[3] Defendants also "object to the amount of fees based on the fact that the attorney fees are in excess of recovery." (Defs.' Resp. to Schleben's Mot. 9.) Though Schleben's requested fees ($88,887.50) exceed his damages ($71,562.26), this is not dispositive in determining whether the fees are reasonable. *See Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 n. 8 (6th Cir. 1995) ("based on the policy of the ERISA fee-shifting provision, the amount of the fee award may exceed the amount of money damages").

(4) 22.5 hours for sending three attorneys to a one-day mediation. (*See* Defs.' Resp. Underwood's Mot. Fees at 7–8; Underwood's Mot. Fees Ex. 1.)

The Court agrees that Schleben's and Underwood's requested number of hours are unreasonable in this case, albeit for slightly different reasons than Defendants offer. And rather than use Defendants' proposed line-by-line approach, the Court finds that an across the board reduction is more appropriate. It is common for courts to apply across the board reductions to requested fee awards. *See*, *e.g.*, *Helfman v. GE Grp. Life Assur. Co.*, No. 06-13528, 2011 WL 1464678, at *8 (E.D. Mich. Apr. 18, 2011) (imposing 20% reduction due to block billing and "vague entries"). This is especially appropriate when, as here for Underwood, the documentation supporting the fees is "voluminous." *See Communities for Equity v. Michigan High Sch. Athletic Ass'n*, No. 1:98-CV-479, 2008 WL 906031, at *4 (W.D. Mich. Mar. 31, 2008) ("Where fee documentation is voluminous, some courts have found it impractical to engage in a precise line-by-line analysis and favor across-the-board reductions." (citing *Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994)).

The attorneys' use of block billing is one reason that an across the board reduction is appropriate here. "[T]he documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 553 (6th Cir. 2008) (quoting *United Slate, Local 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 n.2 (6th Cir.1984)). "Courts in this circuit have reduced attorney fees on the basis of insufficient billing descriptions where . . . billing records lumped together time entries under one total so that it was impossible to determine the amount of time spent on each task." *Id.* (internal quotation marks

and citations omitted); *see also Bell v. Prefix, Inc.*, 784 F. Supp. 2d 778, 787 (E.D. Mich. 2011) ("In the Sixth Circuit, the law is clear that significant reductions in time are appropriate where block billing is used").

Numerous billing entries in Underwood's case are block-billed. An example of this is a 6.5 hour entry for Cantarella on June 6, 2014:

> CONFERENCE WITH RPG RE (1) MOTION FOR CONSOLIDATION, BRIEF IN SUPPORT, EXHIBITS THERETO AND PROPOSED ORDER; AND (2) NOTICE OF MOTION FOR CONSOLIDATION; REVISE ALL OF THESE DOCUMENTS AND PUT ALL IN PDF FORM (EXCEPT ORDER); TELEPHONE CONFERENCE WITH ECF HELP DESK TO MAKE SURE I UNDERSTAND THE E-FILING PROTOCOLS FOR FILING THE NOTICE IN THE SCHLEBEN CASE WHERE I DO NOT REPRESENT ANY OF THE PARTIES; EMAIL THE PROPOSED ORDER TO COUNSEL FOR DEFENDANTS AND COUNSEL FOR SCHLEBEN; LENGTHY GROUP MAIL TO ALL ON MY CLASS MEMBER LIST, UPDATING THEM ON THE STATUS OF THE CASE AND PROVIDING SOME GENERALIZED INFORMATION ABOUT CLASS ACTIONS.

(Underwood's Mot. Fees Ex. 1, at 17.) Another example is her 6.75 hour entry from November 25, 2013:

> TELEPHONE CONFERENCE WITH [TWO INDIVIDUALS] WHO HAVE SAME CLAIM AS CLIENT; UPDATE CLASS MEMBER SPREADSHEET AND CLASS MEMBER GROUP MAIL; CONTINUE PREPARATION OF CLASS CERTIFICATION BRIEF.

(*Id.* at 6.) Because of the block billing format of these entries, the Court cannot determine how much time was spent on administrative tasks compared to the substantive tasks. They also include administrative tasks for which one might not expect a partner to bill $525. *See Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir.1983) ("Nor do we approve the wasteful use of highly skilled and highly priced talent for matters easily delegable to non-professionals or less experienced associates. Routine tasks, if performed by senior partners in large firms, should not be billed at their usual rates. A Michelangelo should not charge Sistine Chapel rates for painting

a farmer's barn."). This issue is pervasive throughout Underwood's bills. Breskin's billing entries in Schleben's case are less heavily block-billed than those in Underwood's case, but there are still many block-billed entries.

Nevertheless, block-billing is not the only reason for an across the board reduction. The primary reason for a reduction is that, as the Court discussed above, the factors for awarding fees on balance weigh in favor of fees only for the phase of the case that came as a result of the Defendants' October 2014 Amendment. Much of the requested fees relate to the initial phase of the case. But it would be impractical for the Court to parse through, line-by-line, over a hundred pages of billing entries between the two cases to determine the precise breakdown of fees for each phase of the case. Nor would it be possible. The block billing entries preclude drawing any conclusions as to how much time was spent on specific tasks. This all makes an across the board reduction the most appropriate way to bring the requested fees to a reasonable level in the circumstances of this case.

Accordingly, the Court finds that a 20% across-the-board reduction is appropriate for the hours requested by Schleben's and Underwood's attorneys. For Underwood, this reduction takes into account that his attorneys are more entitled to fees for their work in the second phase of the case involving the October 2014 Amendment, and to a substantial extent, their work in certifying a class action. But there is less rationale to award fees for the rest of case. And their use of block billing makes the case for a full award even less justified. For Schleben, this reduction recognizes that a fee award for the first phase of the case is even less justified for him because he opted out of the class. Thus, the Court finds that a 20% percent reduction is appropriate in both cases to keep the fees at a reasonable level in these circumstances. Though the Court does not agree with all of Defendants requested line-by-line reductions, the across the board reduction

will more than cover those requests. Finally, notwithstanding the reduction, the awarded fees are still very sizeable for a case that involved several motions, no trial, and a relatively modest class size.

The tables below reflect the attorneys' requested fees compared to the Court's award.

| Schleben | | | | | | |
|---|---|---|---|---|---|---|
| **Attorney** | **Hourly Rate** | | **Hours** | | **Rate (x) Hours** | |
| | *Requested* | *Awarded* | *Requested* | *Awarded (20% reduction)* | *Requested* | *Awarded* |
| Breskin | $325 | $325 | 273.50 | 218.80 | $88,887.50 | $71,110.00 |

| Underwood | | | | | | |
|---|---|---|---|---|---|---|
| **Attorney** | **Hourly Rate** | | **Hours** | | **Rate (x) Hours** | |
| | *Requested* | *Awarded* | *Requested* | *Awarded (20% reduction)* | *Requested* | *Awarded* |
| Cantarella | $525 | $475 | 1,364.05 | 1,091.24 | $716,126.05 | $518,339.00 |
| Geller | $525 | $475 | 429.20 | 343.36 | $225,330.00 | $163,096.00 |
| Schram | $525 | $475 | 43.10 | 34.48 | $22,627.50 | $16,378.00 |
| Rucker | $380 | $250 | 4.60 | 3.68 | $1,748.00 | $920.00 |
| Howes (paralegal) | $135 | $125 | 10.25 | 8.20 | $1,383.75 | $1,025.00 |
| **Total** | | | | | $967,215.30 | $699,758.00 |

**3.**

Plaintiffs also ask for costs. The Court may award reasonable costs. *See* 29 U.S.C. § 1132(g)(1). Schleben requests $416.52 in costs (for filing his complaint and serving process on Defendants). (Schleben's Mot. at 14.) Underwood asks for $16,441.63 (Underwood's Mot. Fees

24

at 26), much of which stems from actuarial services (*Id.* Ex. 1, at 84–85). Defendants make no arguments concerning the costs. Having reviewed the requested costs, the Court finds that they are reasonable.[4]

## III.

Finally, Schleben asks the Court to clarify that he is entitled to receive unreduced benefits in the future until he reaches the age of 62, or until he becomes otherwise disqualified from receiving benefits pursuant to Plan § 5.4. (Schleben's Mot. at 2.) Underwood does not seek similar relief at this time.

Defendants offer no argument on this issue, remarking only that "[t]o the extent that this request for relief is tied to Plaintiff's 502(a)(3) request for relief . . . , no ruling has issued as to 502(a)(3)." (Defs.' Resp. at 2.) But relief in the form of a declaratory judgment under § 502(a)(1)(B) is different from the relief available under § 502(a)(3). The latter allows a plan "participant, beneficiary, or fiduciary" to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). The former, § 502(a)(1)(B), enables a plan participant or beneficiary to bring a civil action to, among other things, "clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). This provision allows someone "to obtain a declaratory judgment of future entitlement to benefits under the provisions of the plan contract." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108 (1989); *see also Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 492 (6th Cir. 2009) (explaining that

---

[4] The Court notes that Schleben and Defendants agree that $71,562.26 is an accurate calculation of damages based on the Plan's benefit reduction dating to August 2013. (Schleben Mot. at 2–3; Dkt. 49, Defs.' Resp. to Schleben's Mot. at 2.) The briefing in the motions in Underwood's case do not address damages.

recovery of benefits due, declaration of rights under a plan, and an injunction prohibiting a plan administrator from terminating or modifying benefits are   all "cognizable" remedies under § 502(a)(1)(B)).

Accordingly, by way of a separate judgment, the Court will grant Schleben's requested declaratory relief, clarifying that he is entitled to the disability retirement benefits he received prior to the August 2013 Amendment, until he otherwise becomes disqualified from receiving those benefits pursuant to the Plan's terms.

## IV.

For the reasons stated, the Court ORDERS the following:

- Schleben's Motion for Damages (Dkt. 48) is GRANTED IN PART, and Schleben is AWARDED: (1) prejudgment interest at a rate of 5.48% to be applied using the stream of benefits method; (2) attorneys' fees of $71,110.00; (3) and costs of $416.52.

- Underwood's Motion for Prejudgment Interest (Dkt. 86) is GRANTED IN PART, and Underwood is AWARDED prejudgment interest at a rate of 5.48% to be applied using the stream of benefits method.

- Underwood's Motion for Costs and Attorneys' Fees (Dkt. 87) is GRANTED IN PART, and Underwood is AWARDED (1) attorneys' fees of $699,758.00; and (2) costs of $16,441.63.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  March 2, 2016

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 2, 2016.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson